# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 4, 2014

## STATE OF TENNESSEE v. MARQUEZ WILLIAMS

**Appeal from the Criminal Court for Shelby County**
**No. 11-06687      James M. Lammey, Jr., Judge**

_____

**No. W2013-02764-CCA-R3-CD  - Filed January 27, 2015**

_____

Following a jury trial, the Defendant, Marquez Williams, was convicted of aggravated robbery and sentenced to 11 years in the Department of Correction. In this direct appeal, the Defendant challenges the sufficiency of the evidence as it relates to his identification as the perpetrator of the offense. The Defendant also challenges the length of his sentence. Following a thorough review of the record and applicable authority, we affirm the judgment of trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J. joined.

John Scott (on appeal) and James Jones, Jr. (at trial), Memphis, Tennessee, for the appellant, Marquez Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Amy P. Weirich, District Attorney General; and Jessica Banti, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On October 25, 2011, the Shelby County Grand Jury indicted Marquez Williams ("the Defendant") for aggravated robbery, a Class B felony.[1] Following a trial on September 9 -11,

---

[1] A co-defendant, Kevin Ware, was charged with aggravated robbery in the same indictment.

2013, a jury found the Defendant guilty as charged. At a subsequent sentencing hearing, the trial court sentenced the Defendant, as a Range I standard offender, to 11 years in the Department of Correction.

The Defendant filed a timely motion for new trial, which the trial court denied following a hearing. This timely appeal followed.

## I. Factual Background

This case stems from the armed robbery of a pizza delivery driver in Memphis. At trial, Maurice Steele ("the victim") testified that he moved to Memphis in November 2010, after completing military service in Fort Hood, Texas. After moving, he was employed by Domino's Pizza as a delivery driver. The victim recalled that around midnight on May 24, 2011, he received a call to deliver an order of two large pizzas and a two liter bottle of Sprite to a house on Patte Ann Drive. When he arrived at the location, the victim did not see anyone, and it did not appear that anyone was at the residence. The victim parked his car on the street in front of the house and walked up the driveway carrying his pizza delivery bag. About halfway up the driveway, the victim was approached from behind by two men, who yelled for him to "stop right there." When the victim turned around, the men demanded the pizza order and the victim's money.

The victim testified that both assailants appeared to be young, African-American men. He recalled that the first man had on a dark hoodie with a purple bandana "underneath his nose down" and either dark blue or black jeans and the second man wore a light-colored hoodie and white bandana over his nose and the bottom of his face. The first man was holding a Beretta 9mm pistol–the same type of gun the victim used in the military. The victim also noticed that the front site post on the assailant's gun was orange in color. The victim testified that, when he realized that he was being robbed, he was shocked and afraid.

The victim recalled that the man with the gun grabbed the delivery bag out of his hands and then demanded cash. The victim denied having any money, but the assailant made him empty his pockets and took $90 from the victim. The assailant then asked the victim if there was anything else in his car. After the victim assured him there was not, the assailant instructed the victim to get in the car and leave. The victim testified that once he got into his car, it sounded like the assailant fired the weapon into the air. The victim drove away, and once around a corner, he called police and the pizza store.

The victim identified the Defendant as the assailant with the gun. He explained that although it was dark outside, he was able to see the Defendant's face by the lights from an elementary school across the street. The victim additionally stated that there was a motion sensor light on at the house next door.

2

A couple of days after the robbery, the police asked the victim to view a photo lineup. In this photo spread of six pictures, the victim was unable to identify anyone. A few days later, the victim returned to the police station to look at a second photo lineup. Before looking at the photo spread, he was instructed not to pick out anyone unless he was 100 percent sure of the identification. The victim testified that he looked carefully at the pictures and took his time to "make sure that [he] was picking the correct person." When looking at the photographs, the victim used a piece of paper to cover the bottom half of the faces so that he could focus on the top portion of the individuals' faces. After looking at the photos, the victim picked out the Defendant's picture and circled it. He also wrote on the bottom of the photo spread, "[The Defendant] was the first man with the gun. He pulled the gun on me and demanded the pizza order and the money I had. After I gave him what he wanted, he told me to drive off." The victim then signed and dated the form.

The victim testified that he was 100 percent sure that the Defendant was one of the men who had robbed him. The victim explained that he observed the Defendant for "a minute or so" during the robbery and he was able to positively identify the Defendant based upon a scar above the Defendant's eyebrow, the spacing of his eyes, and the size of the Defendant's nose. During trial, the victim pointed out to the jury where on the Defendant he had seen the scar.

On cross-examination, the victim explained that, at the preliminary hearing, the Defendant's attorney asked him if the gunman's bandana was "about midway of the nose," and he replied, "yes, about." He also acknowledged that, during the same hearing, he testified that the gunman had a scar going through his eyebrow. The victim explained that he meant that the suspect had a scar above the eyebrow and he did not intend to say that the scar went through the eyebrow.

Kevin Ware testified that on May 24, 2011, he, the Defendant, and three other individuals–Nakia Jackson, D'Jarvis Parker, and the Defendant's brother, Marquell Wade–planned to rob the delivery driver from Domino's Pizza in order to obtain money to buy drugs. Mr. Ware explained that the group began planning the robbery about 10:00 p.m. while on Patte Ann Drive, a street by Graceland Elementary School. Ms. Jackson used Mr. Ware's cell phone to call Domino's and place an order for two pizzas and soda to be delivered to a house on Patte Ann Drive. Mr. Ware explained that the group picked the address for the delivery because it did not appear that anyone lived there. Mr. Ware testified that the Defendant had a black, 9 millimeter gun with an orange site on it and, when the delivery person arrived, the Defendant was supposed to take the pizza and the driver's money. Mr. Ware was supposed to be the look-out during the robbery and warn the Defendant if he saw police.

3

After Ms. Jackson placed the order, the group sat in a park across from the house where the pizza was to be delivered and waited because they did not want to be seen at the house. While sitting at the park, a car pulled up, shining its lights towards the group. Afraid that it might be the police, the group ran to Mr. Parker's house. However, the Defendant and Ms. Jackson eventually returned to the house on Patte Ann Drive.

The Defendant and Ms. Jackson later returned to Mr. Parker's house with pizza and soda, and the group ate the pizza behind a house. Mr. Ware said he did not see any cash. The Defendant told Mr. Ware that, when the victim pulled up, he made the victim give him the pizza and then told the victim to get in his car and leave. The Defendant also said that he shot his pistol into the air before the victim drove off.

Mr. Ware recalled that, at the time of the robbery, the Defendant was wearing dark clothes, including a black shirt and blue shorts, while Ms. Jackson was wearing white shorts and a white shirt. Mr. Ware testified that, before the robbery, he saw the Defendant and Ms. Jackson put on bandanas as masks. He believed that one bandana was white and one was red. Mr. Ware also confirmed that he heard a gun shot around the time of the robbery.

Mr. Ware admitted that he pled guilty to aggravated robbery in connection with the offense. Mr. Ware stated that he had talked to police about the robbery with the hope that it would help him out, but he denied that he had a deal with the State in exchange for his testimony.

On cross-examination, Mr. Ware acknowledged that he did not tell the police that he heard a gun shot on the night of the robbery or that the Defendant told him about the robbery when it was over. Mr. Ware agreed that, after his arrest, police told him that he was looking at a lot of charges and that it could help his situation if he talked to them.

On redirect, Mr. Ware explained that before he gave his statement to authorities, the police had discovered that the Domino's Pizza order was placed from Mr. Ware's cell phone. Mr. Ware stated that he had thought it might be to his advantage at that point to tell the police the truth about what had happened.

Sergeant Albert Bonner of the Memphis Police Department testified that after he was assigned to investigate the robbery that occurred on Patte Ann Drive, he contacted Domino's Pizza and obtained the phone number of the caller who had placed the delivery order to that location. Sergeant Bonner explained that the phone number belonged to a relative of Mr. Ware and, based upon this information, Mr. Ware became a suspect.

Sergeant Bonner brought Mr. Ware to the police department to talk to him about the offense. Sergeant Bonner acknowledged telling Mr. Ware that, if he cooperated, he would talk to prosecutors to let them know he cooperated. He told Mr. Ware that it could help him "down the road," but he denied making any promises to him. After speaking with his mother, Mr. Ware decided to give a statement to Sergeant Bonner about the offense. Sergeant Bonner explained, "[Mr. Ware] advised us that he, along with others, had planned to rob the pizza man and once the pizza man got there they were going to take the pizza, go back to a different location and they were going to eat the food at that time." Mr. Ware told the sergeant that the Defendant, Ms. Jackson, Mr. Parker, and Mr. Wade[2] had also been involved in the robbery. After developing Mr. Ware as a suspect, Sergeant Bonner prepared a photo lineup to show the victim, which included Mr. Ware's photograph. However, the victim was unable to make a positive identification from this first photo array.

Sergeant Bonner testified that he also interviewed the Defendant about his involvement in the offense. After being read his Miranda warnings, the Defendant signed an advice of rights form and indicated that he wanted to talk to Sergeant Bonner. According to Sergeant Bonner, the Defendant made several inconsistent statements during the interview. For example, the Defendant knew all of the details of the robbery but claimed that he did not participate in it and was not there. Nonetheless, the Defendant admitted that he ate some of the food taken during the robbery. The Defendant claimed he was at his girlfriend's house at the time of the robbery, and he received a phone call from Mr. Ware, Ms. Jackson, and Mr. Parker after the robbery had taken place. After hearing that the group had committed a robbery, the Defendant told his girlfriend about the robbery and decided to meet up with the group. The Defendant claimed that, when he got to the group's location, "everyone was just talking about what happened" and that was how he learned the details of the robbery.

Sergeant Bonner testified that he followed up on the Defendant's statement by talking to the Defendant's girlfriend. The Defendant's girlfriend stated that "she did not know what [the Defendant] was talking about, that he did not tell her anything about a robbery." Sergeant Bonner then placed the Defendant's photograph in a lineup for the victim to view. Before showing the photo spread to the victim, Sergeant Bonner told the victim to take his time and that the person who robbed him may or may not be in the lineup. Because the suspects had worn bandanas over parts of their faces, Sergeant Bonner also told the victim that he could take a blank sheet of paper and put it across the bottom of the faces while looking at them. The victim identified the Defendant and circled his picture. Sergeant Bonner then had the victim write down "what that person did to him" at the bottom of the lineup.

---

[2] Through his investigation, Sergeant Bonner determined that Mr. Wade was not involved in the robbery.

On cross-examination, Sergeant Bonner testified that the victim estimated the first assailant's height as five-nine or five-ten. The arresting officer listed the Defendant's height as five-seven, which the officer likely obtained from the Defendant's driver's license. Sergeant Bonner recalled that the victim also told him that the first assailant had "something above the eyebrow, a discoloration or something" but could not recall if the victim said it was a scar. Sergeant Bonner explained that he placed the Defendant's photograph in the lineup based upon both Mr. Ware and Mr. Wade telling him that the Defendant was involved in the robbery. After selecting the Defendant in the photo lineup, the victim told Sergeant Bonner that he was "pretty sure" of the identification. Based upon this testimony, the jury convicted the Defendant of aggravated robbery.

At the Defendant's subsequent sentencing hearing, the trial court imposed an 11-year sentence. The trial court stated that it based the sentence length on the facts and circumstances of the case, which the court found to "justify more than the minimum [eight-year sentence]." The trial court also considered two enhancement factors–that the Defendant had a history of prior criminal behavior and that the Defendant was the leader in the instant offense. Regarding the first enhancement factor, the trial court found that the Defendant had made statements implicating himself in the robbery of another pizza delivery person that had occurred at the same location the day before the offense in this case. The court indicated, however, that it did not put a lot of weight on this factor. The trial court next considered that the Defendant was a leader of the offense based upon the Defendant's role as the gunman. The court indicated that it placed "a lot of weight" on this enhancement factor.

Regarding the facts and circumstances of the case, the trial court stated:

It just appears from the facts of this case, you have a bunch of thugs sitting around and they decide to call a pizza man and rob him so they can take what little money that he would have and also take the pizza so they can have pizza. I mean, I remember back in the olden days we used to collect Coke bottles and earn and get money to buy stuff. If we wanted to buy a pizza or something like that, we'd earn some money to buy the pizza. So it just seems to me like just that whole picture of seeing some thugs sitting around thinking about we're going to rob some poor dude that's trying to make a living. I don't know, it seems to me like that someone that does that or someone that would have that mindset is a dangerous offender, a dangerous person. So we're talking about just the facts of this case is seems to me . . . would justify more than the minimum.

6

## II. Analysis

### *A. Sufficiency of the Evidence*

On appeal, the Defendant challenges the sufficiency of the evidence, asserting that the victim's identification was unreliable and insufficiently corroborated. Following our review, we find that the evidence is sufficient to support the Defendant's conviction for aggravated robbery.

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, since they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659 (Tenn. 1997). This Court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, aggravated robbery is the "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1) (2011).

When viewed in the light most favorable to the State, the evidence shows that, after an accomplice placed a pizza delivery order to lure the victim to his location, the Defendant approached the victim with a gun and demanded the pizza order and cash from the victim. The Defendant grabbed the pizza delivery bag out of the victim's hands and forced the victim to empty his pockets of cash. The victim testified that once he realized he was being robbed, he was afraid.

7

The defendant argues that the victim's identification was unreliable and only corroborated by Mr. Ware's testimony, rendering the evidence of the Defendant's identity as the perpetrator insufficient. However, the victim positively identified the Defendant as the gunman who approached him, stating that he was "100 percent sure" in his identification. A victim's identification of a defendant as the perpetrator of an offense is, alone, sufficient to establish identity. See State v. Hill, 987 S.W.2d 867, 870 (Tenn. Crim. App. 1998); State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Moreover, the reconciliation of discrepancies in the victim's testimony is a credibility determination, which falls to the province of the jury. See State v. Pope, 427 S.W.3d 363, 369 (Tenn. 2013). Clearly, the jury resolved any conflict in testimony in favor of the State, as was its prerogative. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). We conclude, therefore, that the evidence was sufficient to sustain the Defendant's conviction.

## B. Sentencing

The Defendant also challenges the length of his sentence. He asserts that the trial court improperly relied upon his arrest in the prior robbery to enhance his sentence because there was no evidence to suggest that he was involved in the first robbery. The Defendant further contends that the trial court erred when it used a material element of the offense of aggravated robbery, i.e., that it was accomplished with a deadly weapon, to enhance his sentence. The State counters that the trial court appropriately exercised its discretion in sentencing the Defendant. We agree with the State.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. Id. at 554-55; State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. Bise, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." Id. at 709. Moreover, under those circumstances, this Court may not disturb the sentence even if it had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann.

§ 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2012).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2013).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114 (2013); see also Bise, 380 S.W.3d at 699 n. 33, 704; Carter, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the

9

purposes and principles set out in sections -102 and -103 of the Sentencing Act." Carter, 254 S.W.3d at 346.

In this case, the trial court imposed a sentence within the appropriate range, see Tenn. Code Ann. § 40-35-112(a)(2), and the sentence reflects a proper application of the purposes and principles of sentencing. Thus, we review the trial court's sentencing determinations for an abuse of discretion with a presumption of reasonableness. See Bise, 380 S.W.3d at 707.

The Defendant first asserts that the trial court improperly considered the enhancement factor that the Defendant has a previous history of criminal behavior, see Tenn. Code Ann. § 40-35-114(1), based upon the Defendant's arrest for a robbery that was committed on the day before the robbery in this case. The Defendant correctly notes that, by itself, an arrest is not considered evidence of the commission of a crime and a trial court should not use evidence merely showing an arrest, without more, to enhance a sentence. State v. Marshall, 870 S.W.2d 532, (Tenn. Crim. App. 1993). However, despite the fact that the Defendant was never convicted of the offense, the trial court found by a preponderance of the evidence that the Defendant was involved in the first robbery. See State v. Winfield, 23 S.W.3d 279, 281 (Tenn. 1998) (stating that "a sentencing court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted so long as the facts are established in the record by a preponderance of the evidence.") The trial court based this finding upon the numerous similarities between the two crimes, as detailed in the presentence report,[3] and based upon evidence that Mr. Ware named the Defendant as his accomplice in the first robbery. We find that the record adequately supports the trial court's finding and there was no error in the court's application of enhancement factor (1).[4]

Likewise, we find no error in the trial court's application of the second enhancement factor that the Defendant was a leader in the commission of an offense involving two or more criminal actors. See Tenn. Code Ann. § 40-35-114(2) (2013). Despite the Defendant's claim to the contrary, the trial court did not enhance the Defendant's sentence based upon the

---

[3] Specifically, in both offenses, which occurred on consecutive days: (1) the victim was a pizza delivery driver; (2) the pizza order was placed from Mr. Ware's cell phone; (3) the robbery occurred at the same address on Patte Ann Drive; (4) two assailants robbed the victim–one carrying a handgun; (5) the suspects took the victim's pizza order and cash; and (6) the Defendant later made admissions about having knowledge of the robbery.

[4] In any event, the trial court placed only slight weight on this enhancement factor, and the trial court properly considered the second enhancement factor. Thus, even if the trial court had misapplied the first enhancement factor, we would uphold the trial court's sentence because the trial court relied on other reasons consistent with the purposes and principles of sentencing. Bise, 380 S.W.3d at 706. Moreover, it is clear from the record that the trial court was primarily concerned with the circumstances of offense, which it found justified more than the minimum sentence.

Defendant's possession of a deadly weapon. Instead, the court found that the Defendant's position as the gunman was evidence of the Defendant's leadership role. Additional evidence of the Defendant's leadership role includes the following: (1) the victim identified the Defendant as the only assailant that spoke during the robbery; (2) the Defendant demanded the pizza order and grabbed the delivery bag out of the victim's hands; (3) the Defendant demanded the victim's money and made the victim turn his pockets inside out; (4) the Defendant ordered the victim to get in his car and drive away and fired a shot into the air as the victim did so; and (5) the Defendant shared the stolen delivery order but not the stolen money with his accomplices, all but one of whom had stayed behind at Mr. Parker's house during the robbery. The trial court's reliance upon this enhancement factor was proper.

Based upon the foregoing, we find that the trial court did not abuse its discretion in sentencing the Defendant to 11 years for aggravated robbery. The Defendant is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, we affirm the judgment of the criminal court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE